UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

| RAVEN PRUETT, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | No.: 4:22-CV-56-KAC-SKL |
|  | ) |  |
| TE CONNECTIVITY CORP., | ) |  |
|  | ) |  |
| Defendant. | ) |  |

## MEMORANDUM OPINION AND ORDER

This case is before the Court on (1) Plaintiff's "Motion to Strike Certain Documents and Declaration Testimony" [Doc. 28] and (2) Defendant's "Motion for Summary Judgment" [Doc. 24]. Because Plaintiff has not sufficiently identified any harmful discovery violation, the Court **DENIES** Plaintiff's "Motion to Strike Certain Documents and Declaration Testimony" [Doc. 28]. And because there is no genuine dispute of material fact and Defendant is entitled to judgment as a matter of law, the Court **GRANTS** Defendant's "Motion for Summary Judgment" [Doc. 24].

## I. BACKGROUND[1]

### A. Plaintiff's Employment History With Defendant

Plaintiff is a black woman who began working for Defendant as an "Assembly Operator II" and "Line Setup" on June 1, 2015 [Docs. 24-4 at 2-3; 30-4 at 30]. Gene Hendon supervised Plaintiff from June 1, 2015 to December 9, 2018 [Docs. 24-3 ¶ 2; 30-4 at 28]. Hendon reported to Mark Gilliland, the plant operations manager [*See* Doc. 30-6 at 12]. Gilliland made the decision to

---

[1] Because Plaintiff is the nonmoving Party, the Court describes the facts in the light most favorable to her. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

1

terminate Plaintiff on September 16, 2021 [Doc. 24-4 at 1].

Gilliland made that decision based in part on Plaintiff's "past performance and behavioral issues" [Doc. 24-4 at 1]. In one 2017 incident, Plaintiff "had an emotional outburst and raised her voice during a conversation with management" [*Id.* at 1, 3]. In a separate "conversation related to her pay" "[Plaintiff] became angry with [Gilliland], called [him] a liar, and raised her voice" [*Id.*]. Following this event, "Pruett was counseled by Gene Hendon that her communication style was not acceptable and could result in disciplinary action" [*Id.* at 1]. Gilliland was aware that Plaintiff received "multiple coachings" for this pattern of behavior [*Id.*]. Hendon recalled that he personally "coached her on her behaviors 5-6 times" [Doc. 24-3 ¶ 11]. Plaintiff was denied a promotion to "Assembly Operator III" in 2017 because of this pattern of behavior [*See* Doc. 24-4 at 3-4]. And she was notified that "such behavior could result in her termination" [Doc. 24-4 at 1]. Tammy Taylor replaced Hendon as Plaintiff's immediate supervisor in 2018 [Docs. 24-3 ¶ 2; 30-4 at 29].

**B. The July or August 2021 Incident**

In February 2021, Plaintiff asked to step back from her line setup duties and work only as an assembly operator [Doc. 30-4 at 30]. William Sloan, a white man, took over her duties [*Id.* at 54]. In either July or August 2021, an incident occurred when Sloan believed Plaintiff boxed a "bad part" that he had set to the side [*Id.* at 55]. Plaintiff, using her years of experience in Sloan's role, fixed the part and then went on break [*Id.*]. When Plaintiff returned from break, Sloan was "going ballistic" because "he couldn't find the part" [*Id.*]. Sloan told Plaintiff "I know you're messing with me" and "you are trying to set me up" [*Id.*]. Sloan used profanity—"words like the effing and stuff," but he "didn't call [Plaintiff] a name" [*Id.* at 60].

Sloan left to discuss the issue with Taylor, who supervised Sloan [*Id.* at 55; Doc. 30-4 at 30]. Sloan was upset and talking at a loud volume [Doc. 30-6 at 11]. Taylor calmed Sloan down and told him "this was not going to be tolerated" [*Id.*]. Taylor called Gilliland to report

2

the incident [*Id.* at 12]. Gilliland instructed her to write Sloan up, but Taylor failed to do so because "shift change" "was very hectic" [*Id.*].

At some point after this incident, Sloan moved to being an operator, and Plaintiff resumed her line setup duties with a pay raise [Doc. 30-4 at 31-32]. Plaintiff believes Sloan was removed from the assembly job because "he would show up to work whenever he felt like" [*Id.* at 78].

### C. The September 15, 2021 Incident

On September 15, 2021 another altercation between Plaintiff and Sloan occurred [Doc. 30-4 at 34]. While Plaintiff was "cutting up" at a station with two other employees, Sloan became convinced the three were "watch[ing]" and "laugh[ing] at" him [Doc. 24-6 at 1; 30-3 at 8]. Sloan left his workstation and told Plaintiff something like "if [Plaintiff] had something to effing say to him, then [she] just need[s] to say it" [Doc. 30-4 at 36]. Accounts of what Sloan said exactly vary somewhat in the record. One of the employees standing with Plaintiff recalls that he said "what the fuck are you staring at" [Doc. 30-3 at 9]. Plaintiff included an unattributed written statement with her response that claims he told Plaintiff to instead "shut her damn mouth" [Doc. 30-7 at 1]. And Sloan told Theresa Balentine that he used the word "hell" [Doc. 30-1 at 16]. But by all accounts, Sloan approached Plaintiff and used inappropriate language. Plaintiff told Sloan no one was laughing at him, and Sloan returned to his station [Doc. 30-4 at 39].

Next, Plaintiff needed to talk to the water spider—an employee responsible for distributing production supplies—in the breakroom [*Id.*]. To get to the breakroom Plaintiff walked through the aisle behind Sloan's machine. Plaintiff decided to sing and dance down the aisle as she passed Sloan because she is a "happy person" and wanted Sloan to know he could not "steal her

3

joy" [*Id.* at 41].[2] As Plaintiff danced past him, Sloan asked her "why [she] hated him so much" [*Id*]. Plaintiff told him "[they] were friends" and continued to the breakroom [*Id.*].

Plaintiff found Taylor, their supervisor, in the breakroom and told her about the confrontation with Sloan [*Id.* at 42]. Plaintiff walked with Taylor back out to the plant floor [*Id.* at 45]. As Plaintiff and Taylor approached, Sloan and Plaintiff both began yelling, trying to tell their sides of the story [*Id.* at 47]. As they were shouting, Plaintiff recalls Sloan "balling up his fists," and she could see "the veins popping in his neck" [*Id.*]. Taylor stepped in between the shouting employees and told Sloan to come with her to the office to discuss the incident [*Id.*]. Sloan disengaged promptly [Doc. 24-9 at 3]. In contrast, Plaintiff shouted at Sloan that he was a "bitch" and a "coward" and that he should not act this way "as a man" [Doc. 30-4 at 48-49].[3] Taylor repeatedly told Plaintiff to stop and to calm down while Plaintiff shouted [Doc. 30-6 at 15-16]. Taylor eventually led Plaintiff and Sloan into separate offices [Doc. 30-4 at 49]. Because no human resources representative worked that shift, through the night and early morning, Plaintiff and Sloan did not speak with human resources until after the shift was over [*Id.* at 61].

### D. Plaintiff's Termination

Theresa Balentine, a human resources representative employed by Defendant, first called Sloan [Doc. 30-1 at 16]. Sloan admitted to using inappropriate language and apologized [*Id.*]. Sloan was suspended, and "accepted the response" [Doc. 24-5 at 3].

Balentine then called Plaintiff and asked for her side of the story [Doc. 30-1 at 15]. Plaintiff admitted to calling Sloan a "bitch," but she refused to apologize [Doc. 30-4 at 68]. When Balentine

---

[2] Sloan reported that Plaintiff came up behind him and began "twerking" to provoke him [Doc. 30-1 at 15].
[3] Here again there is some variation in the record about exactly what Plaintiff said, but Plaintiff agrees that she said at least these things to Sloan [Docs. 30-4 at 48-49, 54; 30-6 at 15].

4

asked Plaintiff whether she thought this was professional conduct, Plaintiff responded by stating that Defendant should already have terminated Sloan [*Id.* at 62]. Plaintiff repeatedly asked Balentine whether disciplinary action was taken against Sloan [*Id.*]. Balentine refused to discuss disciplinary action for other employees [*Id.*]. When Plaintiff refused to drop the issue, Balentine ended the call [*Id.*]. Plaintiff called Balentine back "two or three times," and called Balentine unprofessional for ending the calls [*Id.* at 63]. After Balentine ended the final call on September 15, 2021, Plaintiff called Defendant's corporate ConcernLINE to complain that she was discriminated against based on race and sex [*Id.* at 80].

Balentine prepared a disciplinary recommendation based on her investigation [Doc. 24-4 at 1]. Balentine did not consider either employee's history of misconduct because the incidents were not included in the employees' files [Doc. 30-1 at 24-25].[4] Balentine recommended to Gilliland that Sloan be retained and moved to a different shift effective immediately [*Id.* at 4]. Balentine based this recommendation on Sloan's honesty, contrition, and understanding that such behavior would not be tolerated moving forward [*Id.* at 1]. Balentine recommended that Plaintiff be terminated immediately [*Id.*]. She based this recommendation on Plaintiff's failure to take responsibility for her actions, which indicated the misconduct was likely to happen again [*Id.*]. Defendant's "Global Workplace Respect and Civility Policy" prohibited "abusive conduct" including "directing vulgar, obscene or profane gestures or words at another individual" and "verbal or physical conduct that a reasonable person would find offensive or humiliating" [Doc. 24-7 at 2].

---

[4] Plaintiff argues that Balentine was aware of Sloan's prior misconduct, but not Plaintiff's [*See* Doc. 30 at 3]. However, the undisputed evidence shows Balentine was unaware of the July/August incident [*See* Doc. 30-1 at 19]. Plaintiff never discussed the incident with Balentine [Doc. 30-4 at 56]. Taylor did not testify that she discussed the incident with Balentine, and Taylor did not submit a write-up that would have been in Sloan's file [Doc. 24-10 at 4].

5

Gilliland agreed with Balentine's recommendation [Doc. 24-4 at 1]. He based his decision on Balentine's findings and on his personal knowledge of both employees' history [*Id.*]. Gilliland specifically recalled denying Plaintiff a promotion for similar hostile and insubordinate conduct [*Id.*]. Gilliland also recalled Plaintiff losing her temper and loudly calling him a liar in the past [*Id.*]. And he remembered that Plaintiff's previous supervisor gave her "multiple coachings" for this behavior and warned her that it could result in termination [*Id.*] Balentine called Plaintiff and informed her of the decision on September 16, 2021 [Doc. 30-1 at 34-36]. Neither Gilliland nor Balentine were aware of Plaintiff's call to the ConcernLINE until after Plaintiff was terminated on September 16, 2021 [Docs. 30-1 at 19; 24-4 at 1; *cf.* Doc. 30-4 at 81].

**E. Procedural History**

Plaintiff filed a timely EEOC charge and received a Notice of Right to Sue on August 17, 2022 [Doc. 1 ¶ 4]. Plaintiff then filed the present Complaint [Doc. 1] alleging sex discrimination, race discrimination, and retaliatory discharge in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e ("Title VII") [*Id.* ¶¶ 13-15]. Following discovery, Defendant moved for summary judgment on all claims [*See* Doc. 24]. Plaintiff opposed summary judgment on the race and sex discrimination claims, arguing that there are "genuine issues of material fact that must be resolved by a jury" [*See* Doc. 30 at 11]. Plaintiff, however, did not oppose Defendant's argument regarding the retaliatory discharge claim [*See generally* Doc. 30]. Plaintiff also moved to strike certain declarations and attachments included with Defendant's Motion for Summary Judgment based on alleged discovery violations [Doc. 28 at 1].

## II. PLAINTIFF'S MOTION TO STRIKE

Citing no law or legal authority,[5] Plaintiff moves to strike (1) "paragraphs 4-7 of Mr. Gilliland's declaration;" (2) "paragraphs 3-10 of Mr. Hendon's declaration;" and (3) "the Exhibits to William Hendon's and Mark Gilliland's declarations" [Doc. 28 at 2]. Additionally, she requests that these materials "not be considered in the Court's summary judgment order and opinion" [*Id.*]. Federal Rule of Civil Procedure 37(c)(1) provides: "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Rule 37(c)(1) "mandates that a trial court punish a party for discovery violations in connection with Rule 26 unless the violation was harmless or is substantially justified." *United States ex rel. Tenn. Valley Auth. v. 1.72 Acres of Land*, 821 F.3d 742, 752 (6th Cir. 2016). The Sixth Circuit has found a violation "harmless" where it "involves an honest mistake on the part of a party coupled with sufficient knowledge on the part of the other party." *Roberts ex rel. Johnson v. Galen of Va., Inc.*, 325 F.3d 776, 783 (6th Cir. 2003).

The Court addresses each of Plaintiff's requests in turn. ***First***, Defendant disclosed Gilliland to Plaintiff under Rule 26 on March 21, 2023 [*See* Doc. 35-1 at 2]. Moreover, it specifically disclosed him as a witness with "knowledge concerning Defendant's human resources policies and practices, Plaintiff's employment with Defendant, the issues raised by Plaintiff and measures taken as a result, communications with and about Plaintiff, the circumstances surrounding Plaintiff's termination, and Defendant's good faith efforts to comply with federal and state anti-discrimination laws" [*Id.*]. It appears that Plaintiff chose not to depose Gilliland.

---

[5] *See* E.D. Tenn. L.R. 7.1(b) (requiring a brief to include "a concise statement of the factual and legal grounds which justify the ruling sought").

7

Plaintiff's failure to develop Gilliland's testimony in a deposition does not entitle her to relief under Rule 37.

***Second***, Defendant asserts that it learned of Hendon's potential relevance to this case from Plaintiff's own deposition on February 8, 2024 [Doc. 35-1 at 1]. Plaintiff does not refute this representation [*See* Doc. 30]. In her deposition, Plaintiff identified that Hendon was her supervisor for "a couple years, maybe more than a couple years" [Doc. 30-4 at 29]. After the deposition, Defendant investigated "what, if any, information Hendon may have that is relevant to the case" [Doc. 35-1 at 3]. Plaintiff knew throughout the case that Hendon had served as her supervisor and would have relevant knowledge of her past disciplinary history [*See* Doc. 30-4 at 28]. The failure to disclose Hendon as a witness therefore was a harmless violation of Rule 26(a). *See Roberts*, 325 F.3d at 783. In any event, even if the Court struck every paragraph in Hendon's declaration that Plaintiff challenges, the Court would reach the same conclusion regarding Defendant's Motion for Summary Judgment.

***Finally***, with regard to the emails attached as exhibits to both declarations, Plaintiff has not identified a request for production to which the emails would be responsive [*See* Doc. 28]. Without knowing whether Defendant was under a duty to produce the emails prior to March 11, 2024, when it did, the Court cannot determine that any violation has occurred. Accordingly, the Court denies Plaintiff's "Motion to Strike Certain Documents and Declaration Testimony" [Doc. 28].

## III. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56, the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the facts in the light most favorable to the nonmoving party and make all reasonable inferences that can be drawn from

those facts. *Matsushita*, 475 U.S. at 587; *Nat'l Satellite Sports*, 253 F.3d at 907. The moving party bears the burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the moving party has met this burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing *Matsushita*, 475 U.S. at 586); *see also* Fed. R. Civ. P. 56(c)(1). A dispute over a fact is only a "genuine issue" if a reasonable jury could find for the nonmoving party on that issue. *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1048 (6th Cir. 2001) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Summary judgment must be entered where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### A. Defendant Is Entitled To Summary Judgment On Plaintiff's Race And Sex Discrimination Claims.

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Because Plaintiff relies only on circumstantial evidence of discrimination, the *McDonnell Douglas* burden-shifting framework applies. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973); *Boshaw v. Midland Brewing Co.*, 32 F.4th 598, 605 (6th Cir. 2022). Under this framework, Plaintiff bears the burden of establishing a prime facie case of discrimination. *Levine v. DeJoy*, 64 F.4th 789, 797 (6th Cir. 2023) (citing *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008)). If Plaintiff succeeds, the "burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's'" treatment. *Id.* (quoting *Texas Dep't of Comm. Affairs v. Burdine,* 450 U.S. 248, 253 (1981)). And if Defendant succeeds, the burden shifts back

9

to Plaintiff once more "to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons but were a pretext for discrimination." *Id.*

Plaintiff cannot establish a prima facie case because her comparator was not "engaged in the same conduct." *Id.* To establish a prima facie case, Plaintiff must demonstrate "(1) [s]he is a member of a protected class; (2) [s]he was qualified for [her] job; (3) [s]he suffered an adverse employment decision; and (4) [s]he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *Id.* (quoting *White*, 533 F.3d at 391).

The Parties do not dispute, for the purposes of summary judgment, that Plaintiff was a member of a protected class, was qualified for her job, and suffered an adverse employment decision. The only challenge to Plaintiff's prima facie case is whether she was "treated differently than similarly situated non-protected employees." *See id.* at 797. Plaintiff must show she was "similarly situated" "in all of the relevant respects" and engaged in acts of "comparable seriousness" to the employee she claims was treated better. *See Johnson v. Ohio Dep't of Pub. Safety*, 942 F.3d 329, 331 (6th Cir. 2019) (citation omitted). The Court considers whether "the employees: (1) engaged in the same conduct, (2) dealt with the same supervisor, and (3) were subject to the same standards." *Id.* (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

Taylor supervised Sloan and Plaintiff at the time of both the July/August incident and the September incident. And more significantly, Gilliland made the final disciplinary decision for both Sloan and Taylor. Additionally, both Sloan and Taylor were subject to the same "Global Workplace Respect and Civility Policy" that prohibited "abusive conduct" including "directing vulgar, obscene or profane gestures or words at another individual" and "verbal or physical conduct that a reasonable person would find offensive or humiliating" [Doc. 24-7 at 2].

The Parties mainly dispute whether Plaintiff and Sloan were "engaged in the same conduct." *See Johnson*, 942 F.3d at 331. There are significant differences. ***First***, Plaintiff had a longer history of similar behavior. Both Sloan and Plaintiff were previously coached for their temperament when interacting with others [Docs. 24-10 at 3-4; 24-4 at 1]. But Sloan was coached once, and Plaintiff was coached "5-6 times" [*See* Doc. 24-3 ¶ 11]. Defendant previously denied Plaintiff a promotion for this conduct [*See* Doc. 24-4 at 3-4]. And Plaintiff had previously been warned that her behavior "could result in disciplinary action," including termination [*Id.* at 1].

***Second***, Plaintiff did not merely use inappropriate language on September 15, 2021; she insulted and degraded a coworker. Sloan used inappropriate language, but never "called [Plaintiff] a name" [*See* Doc. 30-4 at 36]. As Sloan walked away at the direction of his supervisor, Plaintiff berated Sloan, calling him a "bitch" and a "coward" and criticizing his behavior "as a man" [*See id.* at 47-48]. ***Third***, Plaintiff was insubordinate, in a way that Sloan was not. When Taylor instructed the two to disengage, Sloan complied [Doc. 24-9 at 3]. Plaintiff escalated [Doc. 30-4 at 48-49]. And her escalation undermined her supervisor's attempts to diffuse the situation [Doc. 30-6 at 15-16]. ***Finally***, while Sloan expressed remorse for his misconduct, [Doc. 30-1 at 16], Plaintiff refused to apologize or take responsibility when Balentine called to discuss the incident, [*id.*; Doc. 30-4 at 68].

These are meaningful distinctions between Plaintiff and Sloan that would lead one to expect the employees to be treated differently. *See Johnson*, 942 F.3d at 332 (noting that when the "quantum of misbehavior is radically different" "one would naturally expect a radically different disciplinary outcome" (citation omitted)). Even resolving all disputed facts in Plaintiff's favor, she has not met her burden of showing their conduct was of "comparable seriousness." *See id.* at 331-32.

11

Even if Plaintiff established a prima facie case, she cannot show that Defendant's reason for her termination was a pretext. At the next step of the framework, Defendant must provide a "legitimate, nondiscriminatory reason for" Plaintiff's termination. *See Levine*, 64 F.4th at 797. Gilliland believed Plaintiff would "do something like this again" [Doc. 24-4 at 1]. He based his decision to terminate her on his "own personal knowledge of [Plaintiff's] past performance and behavioral issues and multiple coachings" [*Id.*]. He also based it on Balentine's finding that Plaintiff lacked remorse [*Id.*]. And he thought Plaintiff's behavior was "consistent with [her] prior behavioral issues" [*Id.*]. At step two, these reasons suffice.

"Once the employer has come forward with a nondiscriminatory reason for firing the plaintiff, 'the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination.'" *Jackson*, 814 F.3d at 779 (quoting *Provenzano v. LCI Holdings, Inc.*, 663 F.3d, 806 812 (6th Cir. 2011)). Plaintiff may show Defendant's stated reason "was insufficient to warrant" her termination. *See id.* (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)). Such a challenge "ordinarily . . . consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Id.* at 779-80. The Court "focus[es] on the severity of the differently treated employees' actions." *Id.* at 780 (quoting *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 350 (6th Cir. 2012)). "The relative severity of two actions is not determined solely by whether those actions violated the same company rule or policy." *Id.* (quoting *Perez v. Illinois*, 488 F.3d 773, 777 (7th Cir. 2007)). The Court is "free to consider both the actual and potential consequences of the employee's actions." *Id.*

12

Plaintiff argues that Defendant's stated reason for her termination is a pretext because Defendant did not apply the same standard to Plaintiff and Sloan. As previously discussed, however, their conduct was not "substantially identical." *See Jackson*, 814 F.3d at 779-80. Although Plaintiff and Sloan both used inappropriate language, Plaintiff was insulting and degrading to Sloan and insubordinate to Taylor [*See* Docs. 30-4 at 36, 48-49; 30-6 at 15-16]. Additionally, Plaintiff had a substantially longer history of both inappropriate behavior and insubordination coupled with warnings that further disciplinary action would be taken if the conduct persisted [*See* Doc. 24-4 at 1]. That history combined with her lack of remorse indicated to her employer that she would persist in this behavior if not terminated [*See* Docs. 24-4 at 1; 30-1 at 15, 23]. Because Plaintiff's conduct is not identical to her only identified comparator, she has not put forth sufficient evidence for a jury to determine that Defendant's stated reason for her termination was a pretext for race or sex discrimination. *See Jackson*, 814 F.3d at 782. Accordingly, the Court grants Defendant's Motion for Summary Judgment on Plaintiff's race and sex discrimination claims.

### B. Defendant Is Entitled To Summary Judgment On Plaintiff's Retaliatory Discharge Claim.

Claims of retaliatory discharge are also governed by the *McDonell Douglas* burden-shifting framework. To establish a prima facie case of retaliatory discharge Plaintiff must show that (1) she engaged in a protected activity; (2) the protected act was known to her employer; (3) her employer then took an adverse employment action against her; and (4) there was a causal connection between her protected activity and the adverse action. *Kirkland v. City of Maryville*, 54 F.4th 901, 910 (6th Cir. 2022). It is not enough for Plaintiff to show that any of Defendant's employees knew of her protected activity, "to prove causal connection" Plaintiff "must establish that the

13

Case 4:22-cv-00056-KAC-SKL   Document 43   Filed 06/10/24   Page 13 of 15   PageID #: 777

decisionmakers involved in the [adverse action] at issue had knowledge of the protected activity." *See Scott v. Eastman Chem. Co.*, 275 F. App'x 466, 482 (6th Cir. 2008).

As an initial matter Plaintiff has abandoned her claim that Defendant retaliated against her for engaging in a protected activity. "[A] plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013); *see also Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009) ("The failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion."). Defendant fully briefed its motion for summary judgment on Plaintiff's retaliatory discharge claim, demonstrating that no decisionmaker was aware of Plaintiff's ConcernLINE complaint before she was terminated. And Plaintiff provided no response. This alone is sufficient to grant Defendant summary judgment on this claim. *See Brown*, 545 F. App'x at 372. But even if Plaintiff had opposed Defendant's Motion, summary judgment is appropriate on this record.

Plaintiff cannot show that any decisionmaker was aware of her ConcernLINE complaint. Gilliland, the ultimate decisionmaker, was unaware of her ConcernLINE complaint on September 16, 2021 [Doc. 24-4 ¶ 9]. Balentine, who recommended Plaintiff's termination to Gilliland, did not learn of Plaintiff's complaint until "much later" [Doc. 24-11 at 7]. And Plaintiff, herself, has no reason to believe Balentine "would have been aware that [she] called the hotline" until after Plaintiff was terminated [Doc. 24-8 at 19]. Gilliland and Balentine "cannot retaliate against an employee for engaging in protected activity unless [they] knew the employee had" engaged in a protected activity. *See Scott*, 275 F. App'x at 482. And Defendant cannot be liable as their employer. Accordingly, the Court grants Defendant's Motion for Summary Judgment as to Plaintiff's retaliatory discharge claim.

## IV. CONCLUSION

For the reasons stated above the Court **DENIES** Plaintiff's "Motion to Strike Certain Documents and Declaration Testimony" [Doc. 28] and **GRANTS** Defendant's "Motion for Summary Judgment" [Doc. 24]. No claims remain in this action. An appropriate judgment shall enter.

SO ORDERED.

s/ Katherine A. Crytzer
KATHERINE A. CRYTZER
United States District Judge
